# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CHANDAN MANANSINGH, an individual, and ANGELA NAIRNS, an individual,<br><br>     Plaintiffs,<br><br> vs.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>     Defendants. | No. 2:20-cv-01139-DWM<br><br><br>FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW |

In June 2020, Plaintiffs Chandan Manansingh[1] and Angela Nairns (collectively, "Plaintiffs") sued the United States and five federal probation officers, alleging constitutional claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and state tort claims under the Federal Tort Claims Act ("FTCA"), based on a 2016 probationary search of their residence and Manansingh's subsequent federal indictment. Following numerous pretrial rulings, only two claims remain: FTCA claims against the United States for intentional infliction of emotional distress (Count 10) and abuse of process (Count 12). [*See* ECF Nos. 73, 85, 89, 90, 111, 124.]

---

[1] Manansingh testified that his name is now Chandon Alexander. Because "Manansingh" was used throughout the case and during trial, it is used here.

A 4-day bench trial took place in Las Vegas, Nevada beginning on May 12, 2025. *See* 28 U.S.C. § 2402. The following witnesses testified:

- Angela Nairns, Plaintiff;
- Chandan Manansingh, Plaintiff;
- Shawn Mummey, Senior United States Probation Officer;
- Todd Fredlund, Deputy Chief United States Probation Officer;
- Chad Boardman, Former Chief United States Probation Officer;
- Robert Aquino, Former Supervisory United States Probation Officer;
- Joy Gabonia, Supervisory United States Probation Officer;
- Sunny Cascio, United States Probation Officer;
- Amberleigh Barajas, Supervisory United States Probation Officer;
- Steven Goldner, Supervisory United States Probation Officer;
- Philip Smith, Jr., former Assistant United States Attorney; and
- Keith Hayes, Plaintiffs' Probation Practices Expert.

Based on the evidence and testimony presented, and further considering the applicable law and the parties' written submissions, the following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1.      While there are numerous exhibits in the case, both parties rely extensively on the United States Probation Office's (the "Probation Office") chronological records, known as the "chronos." (*See* Ex. 103.) While not exhaustive, the parties agree that the chronos represents the most accurate record of the case history.

2.      The probation officers and former prosecutor that testified are found to be credible. Their testimony was consistent with each other and with the written documentation in the case. Nairns is also found to be generally credible, although

2

her testimony was limited and the documentary evidence indicates she was purposely ignorant of many of the underlying facts and circumstances surrounding Manansingh's federal supervision. Plaintiffs' expert, Hayes, is found to be credible, but his testimony is given little weight for the reasons discussed below.

3.     While some of Manansingh's testimony is accepted as credible, he is generally not found to be credible. The specific reasons for that determination are provided in context below.[2]

4.     Two general themes presented in Plaintiffs' case are briefly introduced here. First, Manansingh alleges that the probation officers' conduct was based on a racial animus. While Manansingh is of East Indian heritage, he believes the probation office discriminated against him because they thought he was Black. Second, Manansingh argues that the probation officers assumed an inappropriate prosecutorial/law enforcement role in pursing charges against him. Neither theory is borne out by the record.

## I.     2013 Conviction and Federal Supervision

5.     On November 26, 2013, based on a plea agreement, the United States District Court for the District of Maryland entered a criminal judgment against Manansingh finding him guilty of the offense of Introduction of Misbranded Drugs

---

[2] Although not a basis for this credibility assessment, Manansingh was regularly looking at his phone throughout the trial and, on the third day, left the courtroom repeatedly.

into Interstate Commerce with Intent to Defraud or Mislead. Manansingh was

involved in a sophisticated scheme where he purported to operate a research

company that allowed him to procure injectable chemicals from suppliers, and then

used another company to market and sell the injectable body enhancing drugs to

body builders. Although the total amount Manansingh made during his operation

is unclear, the record indicates he received—and the government did not recover—

upwards of $800,000. He was sentenced to 36 months of probation and was

assessed a $250,000 fine. (Agreed ¶ 1; Ex. 2.)

6.      Pursuant to that 2013 Judgment, Manansingh was prohibited from

"illegally us[ing] or possess[ing] a controlled substance," although he was

excepted from the standard drug testing condition. (Ex. 2 at 2.) Manansingh was

also required to "work regularly at a lawful occupation unless excused by the

probation officer," provide the Probation Office with "any requested financial

information," and make monthly fine payments of $1,000. (Ex. 2 at 2, 3, 5; Ex. 3.)

7.      At the time of his sentencing, Manansingh was residing in Nevada,

(Agreed ¶ 2), with his fiancé, Nairns.

8.      On December 3, 2013, the United States Probation Office of the

District of Maryland requested that the United States Probation Office of the

District of Nevada accept jurisdiction over Manansingh's probation. (Agreed ¶ 3.)

Although supervision of Manansingh's probation was not formally transferred to

4

the District of Nevada until March 18, 2015, (Agreed ¶ 4; Ex. 6), the Nevada

Probation Officer supervised him on a courtesy basis until that point.

9.     From November 2013 to February 2015, Probation Officer Rusty Ellis

was assigned as Manansingh's supervising officer.  (Agreed ¶ 5.)  Chronos entries

during Officer Ellis' supervision indicate that while there was no direct

noncompliance during this timeframe, Manansingh had a negative attitude about

supervision.  (*See* Ex. 103 at 89–105.)

10.     In May 2014, probation officers in the District of Maryland provided a

status report on behalf of Officer Ellis recommending that Manansingh's monthly

fine payments be placed in abeyance until December 2014, which was approved by

the United States District Court for the District of Maryland.  (Agreed ¶ 6.)

11.     In February 2015, Manansingh's supervision was reassigned to

Probation Officer Shawn Mummey.  (Agreed ¶ 7.)  Officer Mummey was hired as

a probation officer in November 2014 and was assigned to the low-risk caseload

responsible for overseeing nearly 300 individuals, including Manansingh.  Officer

Mummey was supervised by Supervisory Probation Officer Robert Aquino.

12.     Officer Mummey was immediately concerned that Manansingh was

not meeting his court-ordered financial obligations because he had fallen behind in

submitting his monthly supervision reports and was not working.  Indeed,

Manansingh had been temporarily suspended from the practice of law because of

his 2013 felony conviction. (*See* Exs. 44, 45.) During this time, Nairns paid

Manansingh's living expenses, including the rent on their shared apartment, which

was leased in Nairns' name. Although Officer Mummey was aware of this

information and Nairns confirmed that she was supporting Manansingh, (*see* Ex.

103 at 71, 100), she was not willing to provide any additional information or

documentation regarding the couple's finances.

13.    Prior to meeting in February 2015, Manansingh informed Officer

Mummey via email of his inability to work based on his bar suspension and the

fact that he would likely not be reinstated before April 2015. (Ex. 109 at 4–5; *see*

*also* Ex. 103 at 87.) Manansingh stated that he "ha[d] applied for employment in

matters that [he] would be qualified in, such as an adjunct professor at a

community college," but that his suspension and felony conviction was "an

impediment to any employment." (Ex. 109 at 5.) This view was consistent with

that taken by Manansingh with his prior supervising officer, Officer Ellis. (*See* Ex.

103 at 101.) For example, when Officer Ellis told Manansingh in January 2014

that he needed to obtain employment, Manansingh "was put off" by the directive

and implied that he did not believe he would need to work before "his suspension

from the bar was eventually resolved." (Ex. 103 at 101.)

14.    During their first meeting on February 27, 2015, Manansingh and

Officer Mummey discussed Manansingh's bar suspension and the timeline for

reinstatement. However, Officers Mummey and Aquino informed Manansingh that he was required to obtain employment of some kind per the standard conditions of his probation. (*See* Ex. 2 at 2.) Manansingh's allegation that Officers Mummey and Aquino yelled at him and were unprofessional during this meeting, which took place at the United States Probation Office, is not credible.

15. Subsequently, Manansingh sought and obtained employment as a law clerk/runner with a lawyer where he made a small monthly income. (*See* Ex. 107.) Manansingh reported this information to Officer Mummey and provided copies of checks received from his employment, along with contact information for his employer. (*See* Ex. 109.) Officer Mummey did not contact Manansingh's employer to verify any of this information but was concerned how Manansingh was depositing his income as Manansingh did not have any bank accounts.

16. To date, Manansingh has not made any payments towards his $250,000 fine. While Manansingh argues that the current status of his payments is not relevant to the underlying issues in the case, it bears on his credibility, undermining his assertion that he has made every effort to be compliant with the terms and conditions of his federal felony conviction.

17. Another consistent point of contention between Officer Mummey and Manansingh was that, despite Manansingh's longtime residence in Las Vegas, Manansingh's vehicle, a Mercedes, was registered in Florida. Officer Mummey

repeatedly told Manansingh that he needed to update his registration. Manansingh never did so despite Officer Mummey's express direction and the requirements of Nevada law. *See* Nev. Rev. St. § 482.385(1)(a).

18.     Officer Mummey was also concerned that Manansingh was using Nairns' vehicle, a BMW, which was not disclosed by Manansingh on his monthly supervision reports. Manansingh told Officer Mummey that Nairns preferred Manansingh did not use her BMW. (*See, e.g.*, Ex. 103 at 53.) Manansingh also testified that he only used the BMW because his Mercedes was having mechanical issues. Ultimately, Officer Mummey could confirm only two times that Manansingh used the BMW. (*See* Ex. 103 at 25, 53.) But one of those times was after Manansingh had been directed by Officer Mummey to disclose the vehicle in his monthly supervision reports and he failed to do so. (*See* Ex. 103 at 25.)

## II.    December 2015 Revocation

19.     In August 2015, Manansingh was arrested by the Nevada Highway Patrol for, *inter alia*, kidnapping, battery domestic violence with a deadly weapon, and driving under the influence. (*See* Ex. 9 at 3.) According to arrest reports, Manansingh and his girlfriend, Teresa Lewis, were driving back from a bar when they got into a fight wherein Manansingh would not let Lewis out of the car but instead called her a whore, struck her repeatedly, and told her that he was driving to the mountains to kill her. (Ex. 9 at 4.) When she finally got out of the vehicle

8

after feigning illness, Manansingh grabbed her by the hair, continued to call her a whore, and kicked her in the ribs. (Ex. 9 at 4–5.) He then left her by the side of the road. (Ex. 9 at 5.) Lewis reported to the responding officers that "Manansingh took steroids and [that] could have contributed to his anger." (Ex. 9 at 5.)

20.     The police reports indicate that Manansingh disagreed with Lewis' account of the incident. (*See* Ex. 9 at 5–7.) However, both officers at the scene determined Manansingh's version of events was not credible as his timeline did not add up. (*See* Ex. 9 at 5–7.) One of the officers also reported that Manansingh attempted to avoid being taken into custody by asking if there was a way they could "work this out" and that he was aware that "sometimes [officers] just drop [people] off at their car . . . ." (Ex. 9 at 7 (latter alteration in original).)

21.     The chronos entries from this time period indicate that the Probation Office was informed by the arresting officers that Manansingh's vehicle contained "numerous bottles of what appear to be some type of supplement." (*See* Ex. 103 at 75.) Those entries indicate that the Probation Office was concerned about this information because Manansingh "[wa]s under supervision for selling illegal supplements." (*See* Ex. 103 at 75; Ex. 2.) However, at that time, Manansingh was not subject to either a probationary search condition or a condition prohibiting any type of supplements. (*See* Ex. 103 at 75.) As a result, the Probation Office neither searched Manansingh's vehicle nor seized the supplements. (*See* Ex. 103 at 75.) It

9

does not appear the supplements were ever tested or identified.

22.     On August 17, 2015, a Petition for Warrant for Offender Under Supervision was filed in the federal court, alleging that Manansingh violated the conditions of his probation by committing the offenses described above and failing to make any payments towards his fine.  (Ex. 10.)  An arrest warrant was issued the same day.  (Ex. 11.)

23.     On August 24, 2015, Lewis provided Officer Mummey with a voluntary written statement, providing further details about the August 9 incident.  (*See* Ex. 12.)[3]  That statement was generally consistent with the information Lewis provided to law enforcement at the scene, which had also been provided to the Probation Office.  (*Compare* Ex. 9 *with* Ex. 12.)

24.     In September 2015, Manansingh pled guilty to two misdemeanors in state court arising out of the August 2015 incident: First Offense Domestic Violence and Coercion.  (*See* Exs. 48, 49.)

25.     On October 7, 2015, Officers Mummey and Aquino met with Lewis for approximately two hours to discuss the August 2015 incident.  (*See* Ex. 103 at 68.)  Her version of events was generally consistent with her written statement and

---

[3] Exhibit 12 was admitted only to establish what information was known by the probation officers at the time, not for the truth of the statements asserted therein.

the police reports and Officers Mummey and Aquino found her to be credible.[4]

Lewis also told Officers Mummey and Aquino that Manansingh had taken her to a

shooting range and they had fired both a handgun and a long-barreled gun and that

Manansingh was using, and possibly selling, steroids.[5]  While both men testified to

this information having been disclosed, neither allegation is reflected in the

chronos summarizing their meeting with Lewis or in Lewis' prior written

statement.  (*See* Exs. 103, 12.)

26.    Lewis also informed Officer Aquino that a former domestic partner of

Manansingh's in Florida had a temporary restraining order against him.  According

to Officer Aquino, he verified the existence of the order, which made Lewis more

credible as it meant that Manansingh had engaged in similar conduct before.

Neither Lewis' report nor verification of this restraining order is noted in the

chronos.  (*But see* Exs. 24, 26 (search forms reflecting prior domestic violence).)

Officer Aquino also conceded that Manansingh did not have any criminal history

prior to his 2013 federal conviction.

---

[4]  Citing Federal Rule of Evidence 806, Plaintiffs sought to admit videos of Lewis
filmed by Manansingh in 2018 to show that Lewis felt that she had been coerced
by Officers Mummey and Aquino to persecute Manansingh.  (*See* Exs. 140, 141.)
That offer was rejected for two reasons.  First, Rule 806 only permits the
introduction of such testimony to rebut admitted hearsay evidence.  Exhibit 12 was
not admitted to prove the truth of Lewis's statements, so it is not hearsay.  Second,
in neither of the proffered videos does Lewis either recant her version of events or
say that she was coerced by the probation officers.
[5] This evidence is subject to the same limitation as Exhibit 12, *supra*.

27.    On December 3, 2015, Manansingh appeared on his federal

revocation petition and, following his admission to having committed state law

violations, a revocation judgment was entered sentencing him to 77 days of

custody followed by 12 months of supervised release.  (Ex. 13.)  As a condition of

his supervision, Manansingh was subject to two months of home confinement,

mandatory drug testing, and the following special conditions, *inter alia*:

> Warrantless Search – You shall submit your person, property,
> residence, place of business and vehicle under your control to a search,
> conducted by the United States probation office or any authorized
> person under the immediate and personal supervision of the probation
> office, at a reasonable time and in a reasonable manner, based upon
> reasonable suspicion of contraband or evidence of a violation of a
> condition of supervision; failure to submit to search may be grounds for
> revocation; the defendant shall inform any other residents that the
> premises may be subject to a search pursuant to this condition.
>
> Steroids – You shall be prohibited from using any legal or illegal []
> steroids that are associated with [] increased [] physical strength.  You
> shall be regularly tested as determined by the probation office, without
> such tests to exceed 104 tests annually for steroid use.
>
> Medications – You shall be required to provide [] medical information
> and a medical determination by a doctor that such medication is
> required and as approved and directed by the probation office.  Any
> over the counter supplements are as approved by a medical doctor and
> as approved and directed by the probation office.

(Ex. 13; Agreed ¶ 8.)

28.    Given the time spent in custody prior to the revocation, Manansingh

was released from custody on December 8, 2015.  (*See* Ex. 103 at 61.)  Officer

Mummey met with him that day to review the conditions of his supervision.  At

that time, Officer Mummey completed a Treatment Referral Form in which he

noted that Manansingh denied ever having been diagnosed with any mental health

issues and that Manansingh claimed he had never seen a psychiatrist or

psychologist. (Ex 14.)  On that form, Officer Mummey also noted that at the time

of the August 2015 incident, "it is alleged that the offender was under the influence

of alcohol and/or possibly controlled substances/steroids." (Ex. 14.)

### III.    January 6, 2016 Revocation

29.    On December 9, 2015, Officer Mummey conducted a home inspection

and again instructed Manansingh to obtain a Nevada registration for his vehicle.

(*See* Ex. 103 at 60.)  Later that same day, Manansingh tested positive for

amphetamines, which he subsequently admitted, claiming he had taken Adderall

that had been prescribed to him since 2010 to treat his ADHD. (*See* Ex. 103 at 56–

57.)  Manansingh showed Officer Mummey a valid prescription bottle. (*See* Ex.

103 at 56.)  Manansingh viewed his violative conduct as a misunderstanding, not

intentional noncompliance.

30.    Officer Mummey reported Manansingh's positive drug test to the

Court, and the Court requested that a revocation petition be prepared. (*See* Ex. 15.)

31.    On December 15, 2015, a revocation petition was filed based on

Manansingh's positive drug test for amphetamines and a minor violation of his

home confinement condition. (Ex. 16.)

32.     On January 6, 2016, Manansingh's supervision was revoked after he admitted to using Adderall that had been prescribed to him but had not been approved by the Court.  (Ex. 17; Agreed ¶ 9.)  He was sentenced to time-served with twelve months of supervision to follow.  (Ex. 17.)  The conditions of supervision in the January 2016 revocation judgment were the same as those imposed in December 2015.  (*Compare* Ex. 13 *with* Ex. 17.)

## IV.    2016 Financial Information, Drug Tests, and Request to Search

33.     By the end of 2015, Manansingh had not made any payments toward his $250,000 fine.  In January 2016, Manansingh failed to provide requested financial information to Officer Mummey or the Financial Litigation Unit of the United States Attorney's Office despite repeated requests to do so.  (*See* Ex. 18, 19.)  The Financial Litigation Unit requested Officer Mummey's help to compel Manansingh's compliance.  (Ex. 20.)  As a result, Manansingh was required to come to the Probation Office to meet with both Officer Mummey and a member of the Financial Litigation Unit in February 2016.  At that meeting, Manansingh was again told he needed to provide certain documentation and apparently agreed to do so.  According to Manansingh, he gave the requested information to his attorney who he believes forwarded it on.  After this meeting, Officer Mummey did not follow up with Manansingh, defense counsel, or the Financial Litigation Unit to confirm whether Manansingh had complied.

34.     On February 1, 2016, Officer Mummey conducted a home visit.  The chronos entry for this visit states that no issues were found but Officer Mummey described Manansingh as "not very talkative as usual and comes off as very arrogant."  (Ex. 103 at 35.)

35.     Also on February 1, 2016, Manansingh submitted a urine sample that tested positive for anabolic steroids, as reported to the Probation Office on February 11, 2016 by Alere Toxicology.  (Agreed ¶ 10; Ex. 21.)

36.     On March 11, 2016, Manansingh submitted a urine sample that tested positive for anabolic steroids, as reported to the Probation Office on March 25, 2016 by Alere Toxicology.  (Agreed ¶ 11; Ex. 23.)

37.     Prior to taking both tests, Manansingh denied any steroid use. Manansingh continues to deny that he ever used steroids.

38.     Officer Mummey did not confront Manansingh about either positive steroid test nor did he immediately report either result to the Court.

39.     However, based on Manansingh's positive drug tests, his failure to make any payment toward his $250,000 fine, and his frequent lack of cooperation and candor, Officer Mummey decided to submit a request to his supervisor seeking authorization for the Probation Office to conduct a warrantless search of Manansingh's residence as provided in the conditions of Manansingh's supervision.

40.     To request a probation search, a probation officer must have

reasonable suspicion that contraband or evidence of a violation of the conditions of supervision may be found at the place to be searched. The basis for that reasonable suspicion is documented in a "search form." This form is then presented and discussed with the officer's direct supervisor. The supervisor may make additions and/or revisions. After this "pre-approval," the request is staffed with the Chief Probation Officer. The Chief may also make additions or revisions to the form and may request that more information be obtained before a search is executed. Ultimately, it is the Chief Probation Officer's decision to approve a probation search. Because searches are intrusive, it was both the policy and practice of the Probation Office to consider alternatives before executing a probationary search.

41.    On March 28, 2016, Officer Mummey prepared a request for search form to obtain authorization to conduct a search of Manansingh's residence ("Search Form"). (Agreed ¶ 12; Ex. 24.) The stated reason for the search was "positive drug screens for anabolic steroids[and] failure to pay anything towards $250,000.00 fine." (Ex. 24.) The Search Form also stated that Manansingh had a prior domestic violence conviction and that there was a "possible handgun + shotgun in home." (Ex. 24.)

42.    Also on March 28, 2016, Officer Mummey sent an email to Alere Toxicology asking whether it was possible to confirm that Manansingh had used steroids since the first test obtained on February 1, 2016. (Agreed ¶ 13.) At this

16

point in time, Officer Mummey acknowledged that he could not definitively say

that Manansingh had used steroids between the two tests or since December 2015,

when the "no steroid" condition was first imposed, as Officer Mummey did not

know how long steroids remain in a person's system.[6]  Based on his experience,

however, Officer Mummey assumed that steroids metabolized at a similar rate as

other controlled substances, i.e., over a matter of hours, days, or weeks.

43.     On March 29, 2016, Officer Mummey met with both Officer Aquino

and Chief United States Probation Officer Chad Boardman to discuss the Search

Form.  During that meeting, Officers Boardman, Mummey, and Aquino discussed

Manansingh's original conviction, which involved the procurement and sale of

body enhancing injectable chemicals.  They also discussed the August 2015

incident, Lewis' reports regarding steroids and firearms, his two revocations, his

lack of any bank accounts, his failure to make any payments toward his court-

ordered fine, and his consistent refusal to comply with even minor directives, such

as updating his car registration or reporting his use of Nairns' BMW.

---

[6] The record is inconsistent whether the use of steroids prior to December 2015
would have violated the condition of Manansingh's original judgment that he "not
illegally use or possess a controlled substance." (Ex. 2 at 2.)  While some
probation officers testified that such use would violate this general condition,
others testified it would not.  Given this inconclusive record and the absence of any
evidence as to the legality or illegality of specific types of steroids, use prior to
December 2015 is not considered violative conduct.  Nevertheless, as discussed
below, the denial of such use, permitted or prohibited, is relevant to Manansingh's
credibility.

44.    Officer Aquino and Chief Boardman both approved Officer Mummey's search request and Boardman added a few notations to the Search Form, including stating that one of the reasons for the search was to look for "evidence of accounts or other income," listing the vehicles that could be searched, and noting under "other comments" that the "instant offense," i.e., the offense for which Manansingh was under supervision, may be related to the "vials found in car during local arrest in 8/2015."[7]  (Ex. 24.)  However, Chief Boardman testified that the reasonable suspicion underlying the search was based solely on Manansingh's positive steroid tests.

45.    Officers Mummey, Aquino, and Boardman all agreed that the failure to pay a court-ordered fine, by itself, was not an independent reason to conduct a search.  However, the totality of circumstances surrounding a particular offender's noncompliance, including nonpayment of fine obligations, may be relevant to a search request if there was reasonable suspicion that unreported income or assets may be located at the offender's residence.  Here, the officers were concerned because Manansingh did not have any bank accounts and they were aware that he had received approximately $800,000 associated with his underlying offense.

46.    On March 30, 2016, after the search was approved but before it was

---

[7] Plaintiffs' counsel emphasized at trial that the while "bottles" of supplements were discovered during the August 2015 incident, (*see* Ex. 103 at 75), the more nefarious term "vials" was substituted as the case against Manansingh progressed.

executed, Victor Uralets, Ph.D., Director of Sports Testing, Redwood Toxicology

Laboratory, replied to Officer Mummey's March 28 email inquiry, stating that the

"creatinine concentration" in the March sample was "2.5 times lower than in the

sample collected in February 2016," and positing, "[p]robably, steroids were not

used by the donor between the two collections." (Agreed ¶ 14; Ex. 25.) Officer

Mummey received that email on March 31, 2016 at 8:16 a.m. (Agreed ¶ 15.)

47.   Officer Mummey informed his direct supervisor, Officer Aquino, of

Dr. Uralets' email but did not report it to Chief Boardman; Officer Aquino does

not recall informing Chief Boardman, and Chief Boardman does not remember

being told. Regardless, Dr. Uralets' email was not noted in the chronos, (*see* Ex.

103 at 25), and no actions were taken to correct or modify the Search Form.

48.   In preparation for the search, Officer Mummey also completed a

"Search Team Checklist," outlining Manansingh's criminal history and stating the

reasons for the search and what they expected to find:

(Ex. 26.)  On that form, Officer Mummey incorrectly identified Manansingh's race as "Black."  (Ex. 26.)

**V.    The April 1, 2016 Search**

49.    On April 1, 2016, at approximately 9:30 a.m., Officers Mummey, Aquino, Cascio, Gabonia, Fredlund, Goldner, and Barajas executed a warrantless search of Manansingh's residence pursuant to his conditions of supervision. (Agreed ¶ 16.)  The parties' account of the search, particularly the conduct of the probation officers, differs.  According to the probation officers, the search was calm and professional.  According to Plaintiffs, the search was confrontational and unprofessional.  Considering all the evidence and testimony, the probation officers' account is more credible.

50.    Officers Mummey and Aquino went up to Manansingh's apartment first, without the rest of the search team.  Officer Mummey explained that they often began searches this way to limit the initial contact and avoid alarming the offender or unnecessarily escalating the situation.

51.    Officers Mummey and Aquino knocked on the door, and Manansingh answered.  Officer Mummey handcuffed Manansingh's hands behind his back and patted him down.  Officer Aquino informed Manansingh that his warrantless search condition was being invoked due to his positive test results for steroid use.  The officers' weapons were holstered.  Officers Mummey and Aquino walked

Manansingh to the living room and had him sit on a sofa while they called the other search team members to advise them that Manansingh had been secured.

52.    The decision to handcuff Manansingh was made prior to the search based on officer safety concerns, including potential steroid use and possible presence of firearms. (*See, e.g.*, Ex. 63 at 3.)

53.    Officer Mummey denies making any racially-charged statements to Manansingh during this interaction. Officer Aquino was present and does not remember any racial epithets being used. Officer Aquino also indicated that if he had heard anything of the sort, he would have written Officer Mummey up for it. Accordingly, Manansingh's assertion that Officer Mummey told him "Niggers don't wear suits and ties to court, they wear handcuffs" is not credible. And, by Manansingh's own testimony, this is the only evidence of racial animus. At no other time during the search or during Manansingh's supervision did any probation officer, including Officer Mummey, use inappropriate racial language.

54.    Manansingh also alleges that Officers Mummey and Aquino had physically harmed him by slamming him up against the wall and by putting his handcuffs on too tight. However, Manansingh did not make any requests or complaints during the course of the search, nor did he report any such misconduct after. This allegation is not credible.

55.    Although Manansingh made it clear he did not want to engage in

small talk with the officers while sitting on the couch, Officers Mummey and

Aquino asked him both whether he had gotten his vehicle registered in Nevada and

whether he had been driving Nairns' BMW. Manansingh admitted he had not yet

changed his registration and initially denied using the BMW. However, Officer

Mummey informed Manansingh that he had personally observed Manansingh drive

the BMW two days prior. (*See* Ex. 103 at 25.) Subsequently, Manansingh

changed his answer, admitting that he had driven the BMW. This blatant lie

further undermines Manansingh's credibility.

56.    Approximately 5 to 10 minutes after initial contact, the other search

team members came up from the lobby. They entered the apartment and

performed a security sweep. Officer Gabonia made a video recording of the entire

apartment prior to the search. (*See* Ex. 39.) The officers then divided into search

teams, with Officers Fredlund and Goldner searching the master bedroom.

Officers Mummy and Aquino remained in the living room, as their role was to

supervise Manansingh.

57.    Shortly after the search began, Nairns, who had just completed her

shift as a night nurse, arrived at the residence. She was advised that she could

come in but also, she was free to leave. Nairns chose to enter the residence

because she was concerned about her pets. Because she chose to stay, she was

directed to sit on a sofa near Manansingh so that the officers could continue their

search unimpeded.  She was not handcuffed or restrained.

58.    Nairns' further communication with the search team was limited to two interactions.  First, in an attempt to put Nairns at ease, the officers asked her about a shelf in the living room that displayed photographs and ashes of her former pets.  When the officers tried to continue the conversation, Nairns said that it was "inappropriate" given the situation.  Second, one of the officers took her into the kitchen to show her where one of her cats had gotten behind a cabinet after the officers had removed the baseboard as part of their search.  Nairns did not make any complaints or raise any objections during the search.

59.    Officer Goldner searched a three-drawer nightstand located next to the bed in the master bedroom, and underneath documents and folders with Manansingh's name on them, he found two pistol magazines loaded with .380 caliber ammunition.  (*See* Ex. 61 at 3–26.)  During his testimony, Officer Goldner clarified that even though the chronos reads as though he was immediately able to identify the caliber, he was not able to do so until he physically unloaded the magazines, which occurred after they were photographed in situ.

60.    One of the documents located in the nightstand with the ammunition was a copy of a 2010 Florida temporary restraining order against Manansingh. (*See* Ex. 61 at 18, 20.)  On this document, the petitioner had checked a box indicating that Manansingh owned or had a weapon, specifically a "9mm

handgun." (Ex. 61 at 18.)  Although this information was not known until after the search was executed, it bears on witness credibility insofar as it bolsters Lewis' report that Manansingh had firearms and undermines Manansingh's repeated assertion that he never has had or used firearms.

61.    The other items of interest found during the search were a duffle bag that was large enough to hold firearms, (Ex. 61 at 30), Lewis' passport, (Ex. 61 at 59–60), four syringes in a plastic bin under the kitchen sink, (Ex. 61 at 51–54), and a white cardboard box in the freezer that contained three glass vials filled with a white powdery substance, (Ex. 61 at 47–50). (*See also* Ex. 34 at 2; Ex. 64 at 2.)  The vials were ultimately tested and did not contain any controlled substances and/or dangerous drugs.  (Ex. 64 at 2.)

62.    The probation officers all deny planting the pistol magazines containing ammunition in Manansingh's nightstand and neither Officer Mummey nor Officer Aquino entered the bedroom prior to their discovery.

63.    Upon being advised that ammunition was located in Manansingh's residence, Officer Aquino telephoned United States District Judge Boulware directly to inform him of the discovery.  Judge Boulware gave verbal permission for the issuance of an arrest warrant that was to be submitted in writing within an hour of their conversation.  Officer Aquino concedes that this phone call was the first time the Probation Office notified the Court of Manansingh's two positive steroid tests.

Officer Aquino also called the United States Attorney's Office to report the discovery of the ammunition.

64.    On April 1, 2016, Officer Mummey completed a Petition for Warrant, citing the discovery of the ammunition and the positive steroid tests. (Agreed ¶ 17; Ex. 27.)

65.    On April 1, 2016, Judge Boulware ordered the issuance of an arrest warrant, and Manansingh was taken into custody pursuant to that warrant. (Agreed ¶ 18; Ex. 28.)

66.    On April 4, 2016, Manansingh was ordered to be detained without bond. (Agreed ¶ 19.)

67.    On April 7, 2016, Officer Mummey completed an Addendum to the Petition, noting that Manansingh had also violated the conditions requiring him to be truthful, not commit a crime,[8] and pay his fine. (Ex. 29.)

68.    On April 14, 2016, upon being told by Manansingh's then-defense counsel that Manansingh had used steroids in July 2015, Officer Mummey sent an email to Dr. Uralets asking, "how long can [anabolic steroids] remain in the human body and continue to test positive in a urine test?" (Agreed ¶ 20; Ex. 30.) Dr. Uralets responded that the substances "may be detected in urine as metabolites for

---

[8] Three additional law violations were identified: failing to obtain a Nevada driver's license, failing to obtain a Nevada vehicle registration, and theft of Lewis' passport. (Ex. 29.)

up to one year after the last use. The time of use cannot be determined on a basis of a single test. The follow up tests may show a new use, if the level go up [sic]." (Agreed ¶ 21; Ex. 30.)

69.     On April 25, 2016, Officer Mummey sent Manansingh's then-defense counsel the documentation for both positive drug tests, as well as both interpretation emails from Dr. Uralets. (Ex. 31.) Thus, while Manansingh testified that he did not "see" the Alere lab result emails until October 2016, (*see* Ex. 126), they were disclosed long before then. Indeed, in an email dated May 2, 2016, Manansingh's then-counsel explicitly stated that "it will be impossible for the government to disprove" Manansingh's denial of steroid use "[p]er the lab test[s]" identified above. (Ex. 53 at 1.)

## VI.    Indictment, Suppression, and June 2017 Revocation

70.     On May 11, 2016, Manansingh was indicted for a violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), under case number 2:16-cr-140, for being a prohibited person in possession of ammunition. (Agreed ¶ 22; Ex. 33.)

71.     On August 4, 2016, Officer Mummey filed a Second Addendum to Manansingh's pending revocation petition, alleging a new law violation associated with the indictment. (Ex. 35.)

72.     In an August 5, 2016 revocation sentencing recommendation submitted to the Court, Officer Mummey outlined the facts in the case, specifically

disclosing the April 2016 email he had received from Dr. Uralets that said that steroids can remain in a person's system for up to a year. (*See* Ex. 64 at 2.) Proceedings on the revocation petition were stayed, however, pending the resolution of Manansingh's new criminal charge.

73.    On November 4, 2016, Manansingh filed a motion to suppress in the new criminal case, arguing that the Probation Office lacked reasonable suspicion to execute the April 1, 2016 probation search. (Agreed ¶ 23.)  The prosecutor on the case, Assistant United States Attorney ("AUSA") Phillip Smith, Jr., contacted Officer Mummey to discuss the search on the basis that Officer Mummey would be called to testify at an evidentiary hearing. (Ex. 127 at 2.)  In response, on November 9, 2016, Officer Mummey sent Smith "a brief synopsis of [the] reasoning for the search." (Ex. 128.)  That summary discussed Manansingh's failure to register his vehicle as directed, his undisclosed and unauthorized use of Nairns' BMW, his opaque financial disclosures, his positive drug tests, and his history of dishonesty, such as his failure to disclose his prescription for Adderall after his December 2015 revocation. (*See* Ex. 128.)  That summary also emphasized the disconnect between Manansingh's nominal income and his expensive living arrangements. (*See* Ex. 128.)  Notably absent from that summary, however, is any reference to the known fact that Nairns was paying Manansingh's living expenses, including rent, and that her name was on the lease for their

apartment.

74.    On March 15, 2017, an evidentiary hearing was held on Manansingh's

motion to suppress. (*See* Ex. 104.)  Officer Mummey was the sole testifying

witness. (*See* Ex. 104.)

75.    On May 26, 2017, in a minute order, Judge Boulware granted the

motion to suppress, and subsequently issued a written order on August 31, 2017.

(Agreed ¶ 24.)

76.    On June 2, 2017, Manansingh was released to a halfway house. (*See*

Ex. 103 at 4.)

77.    On June 22, 2017, a third revocation hearing was held and

Manansingh admitted to violating the conditions of his supervision related to not

being truthful and not paying his fine. (Ex. 37.)  Manansingh was sentenced to

"time served" with no supervision to follow. (Ex. 37.)  At this point, Manansingh

had been detained for over one year.  That experience had a serious impact on

Manansingh's mental health, eroding his desire to take care of himself and

causing/leading to suicidal ideation.

78.    On August 31, 2017, AUSA Smith emailed Judge Boulware's written

suppression decision to Officer Mummey, who responded, "That's an interesting

point of view.  Not one I necessarily agree with but I am a bit biased.  Anything in

there that you feel is our best shot at getting the opinion overturned?" (Ex. 135.)

Ultimately, the United States Attorney's Office decided to appeal the decision, which AUSA Smith testified meant they genuinely believed it was in error.

79.    In May 2018, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") affirmed Judge Boulware's finding that the probation officers lacked reasonable suspicion to conduct a warrantless search under the circumstances. *See United States v. Manansingh*, 733 F. App'x 390 (9th Cir. 2018). And, on June 5, 2018, a mandate was issued. (Agreed ¶ 25.) On June 19, 2018, Smith forwarded the Ninth Circuit's decision to Officer Mummey, stating "We lost." (Ex. 136.)

80.    The indictment was dismissed on June 21, 2018. (Agreed ¶ 26.)

## VII.    Subpoenas Served on Nairns

81.    Following the April 2016 search, AUSA Smith asked Officer Mummey to serve subpoenas on Nairns on three occasions.

82.    First, on May 3, 2016, AUSA Smith emailed Officer Mummey asking him to serve a grand jury subpoena on Nairns, (Ex. 32), which he did on May 5, 2016. After service was completed, AUSA Smith asked Officer Mummey via email whether Nairns "seemed irritated." (Ex. 123.) Officer Mummey responded, "She wasn't happy to see me but she wasn't rude toward me. I would say irritated or inconvenienced would be a good way to describe her demeanor." (Ex. 123.) AUSA Smith testified that it is standard to ask how a potential witness responds to

a witness subpoena as it can be indicative of whether the witness will be cooperative or combative as the case develops.

83.    Second, on August 11, 2016, AUSA Smith emailed the Probation Office asking for a trial subpoena to be served on Nairns, which Officer Mummey did several days later. (Ex. 36.)

84.    Third, on June 14, 2017, Smith requested a witness subpoena be served on Nairns to testify at Manansingh's third revocation hearing, (Ex. 59), which Officer Mummey subsequently did.[9]

85.    In serving the first two subpoenas, Officer Mummey went directly to Nairns' door and knocked. For the final subpoena, Nairns was called down to the reception area of her building to complete service. Nairns admits that Officer Mummey never said or did anything inappropriate or threatening during these interactions, each of which lasted less than five minutes. However, Nairns found his repeated appearance inherently embarrassing and threatening.

86.    At the time of these events, it was common practice for the Probation Office to serve subpoenas on witnesses related to offenders under supervision, such as Manansingh.

---

[9] A fourth subpoena was requested to be served for a May 30, 2017 trial setting. (*See* Ex. 58.) It does not appear this subpoena was served, possibly because the suppression motion was granted on May 26, 2017. (*See* Agreed ¶ 24.)

## VIII. Administrative Claims

87.     On June 24, 2019, the Department of Justice received an administrative tort claim from Plaintiffs, requesting damages in the amount of $14,000,000.  (*See* Ex. 47.)

### CONCLUSIONS OF LAW

88.     Prior to trial, the Court reserved ruling on the government's motion for summary judgment.  [*See* ECF Nos. 133, 138.]  Given the factual issues raised at trial and the disputes resolved herein, that motion is denied.

89.     At the close of Plaintiffs' case, the government moved under Rule 52(c) for a judgment on partial findings as to all of Plaintiffs' claims.  The Court reserved ruling on that motion and directed the government to present its case. After it did so, but prior to closing arguments, the Court granted the government's Rule 52(c) motion as it relates to Nairns' claims.  The reasoning supporting that decision is stated below as Rule 52(c) permits the Court to "decline to render any judgment until the close of evidence" but requires such judgment "be supported by finding of fact and conclusions of law as required by Rule 52(a)."

## I.    Administrative Exhaustion

90.     Before filing suit under the FTCA, a plaintiff must present her claims to the appropriate federal agency.  28 U.S.C. § 2675(a).  "A claim is deemed presented for the purposes of § 2675(a) when a party files (1) a written statement

sufficiently describing the injury to enable the agency to begin its own

investigation and (2) a sum certain damages claim." *Blair v. IRS*, 304 F.3d 861,

864 (9th Cir. 2002) (internal quotation marks omitted).  Generally, such

presentment is made in a Standard Form 95.  *See* 28 C.F.R. § 14.2(a).  An action

may be commenced in court only after the agency denies the claim or fails to make

a final disposition within six months.  28 U.S.C. § 2675(a).  An FTCA claim "shall

be forever barred unless it is presented to the appropriate . . . agency within two

years of" accrual.  28 U.S.C. § 2401(b).

91.    Here, Nairns' claim for intentional infliction of emotional distress is

based on the April 1, 2016 search and her claim for abuse of process is based on

Officer Mummey's repeated service of subpoenas, the last of which occurred in

June 2017.  As Nairns was not the subject of criminal charges, unlike Manansingh,

there is no factual basis to delay accrual or toll the two-year statute of limitations.

Accordingly, Nairns had to present her emotional distress claim to the relevant

agency on or before April 1, 2018 and her abuse of process claim on or before June

22, 2019.[10]  Nairns did not present her administrative claim to the Department of

Justice until June 24, 2019.  (*See* Ex. 47.)  Nairns' claims are therefore barred.  But

---

[10]  The record does not state when Nairns was actually served with the final
subpoena.  However, because that subpoena was to appear at Manansingh's
revocation hearing, which occurred on June 22, 2017, that is the latest such service
could have occurred.

even if that were not the case, they fail on the merits as determined below.

## II.    Preclusion

92.    There are two main forms of preclusion: claim preclusion, also known as res judicata, and issue preclusion, also known as collateral estoppel.  "Claim preclusion provides that a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1130 (9th Cir. 2019) (internal quotation marks, alterations, and footnote omitted).  "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* (internal quotation marks omitted).  This case raises a question of issue preclusion.

93.    As indicated above, Judge Boulware previously found that the probation officers did not have reasonable suspicion to search Manansingh's residence. *See United States v. Manansingh*, 281 F. Supp. 3d 1096 (D. Nev. 2017), *aff'd* 733 F. App'x 390 (9th Cir. 2018).  The parties were directed to brief whether that finding has a preclusive effect in this civil matter.  [ECF No. 162.]  They did so.  [ECF Nos. 167, 168.]

94.    The United States is correct that Judge Boulware's finding in Manansingh's criminal case is not dispositive of the issues in the current case as

neither tort claim requires "the establishment of the absence of reasonable suspicion for a search, nor are they specifically disproven by the existence of reasonable suspicion for a search." [ECF No. 168 at 2.] Thus, this Court need not determine whether there was or was not reasonable suspicion to adjudicate the merits of the present case.

95.    But, even if that were not the case, the United States is also correct that it is not collaterally estopped from arguing that there was reasonable suspicion for the probation search. "Federal law governs the collateral estoppel effect of a federal case decided by a federal court." *Fireman's Fund Ins. Co. v. Int'l Market Place*, 773 F.2d 1068, 1069 (9th Cir. 1985) (citing *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12 (1971)). "To foreclose relitigation of an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

96.    As to the first element, the issues decided in Manansingh's criminal proceeding—that the evidence obtained during the April 1, 2016 search should be suppressed because the officers lacked reasonable suspicion to search—is not identical to the issues underlying Plaintiffs' tort claims of emotional distress and

abuse of process.  As stated above, the resolution of neither tort claim requires a

determination of whether there was reasonable suspicion.  Additionally, in

assessing reasonable suspicion, Judge Boulware did not determine whether the

officers' conduct was extreme and outrageous or whether they had abused process.

*See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1121 (9th Cir. 1997) (rejecting

estoppel effect of state suppression ruling in subsequent civil rights action where

officer asserted qualified immunity).  Thus, the issues are not the same.

97.     Second, the records underlying the two decisions are very different.

Judge Boulware made his decision following an evidentiary hearing wherein

Officer Mummey was the only testifying witness.  Here, the parties have engaged

in extensive civil discovery, including depositions.  Importantly, unlike a criminal

case, Manansingh was required to sit for a deposition and to testify.  Thus, this is

the first time his credibility could be weighed against the probation officers.

Accordingly, while the existence of reasonable suspicion was actually litigated,

that criminal proceeding bears little resemblance to the current case.

98.     Finally, because Manansingh's criminal case was dismissed without

prejudice, there is no "judgment" and there has not been a final adjudication on the

merits.  *Cf. Ehirim v. Cal. Dep't of Transp.*, 2024 WL 5413221, at *2 (C.D. Cal.

Nov. 26, 2024) ("A dismissal without prejudice does not constitute an adjudication

on the merits." (internal quotation marks omitted)).

99.    Accordingly, this Court is not bound by Judge Boulware's finding that there was no reasonable suspicion to search Manansingh's residence.  That said, this Court need not and does not reach a contrary conclusion.  As explained below, the probation officers' conduct is assessed through the lens of whether it was extreme or outrageous or whether they abused process.

## III.    Merits

100.    Under the FTCA, the United States is liable for common law torts committed by federal employees within the scope of their federal employment.  *See* 28 U.S.C. §§ 1346(b), 2674.  Liability is determined by the tort law of the state where the claim arose.  28 U.S.C. § 1346(b)(1).  Accordingly, Plaintiffs' claims for intentional infliction of emotional distress and abuse of process as assessed under Nevada law.

101.    While both parties identify inconsistencies and omissions in the actions of the opposing side, Plaintiffs ultimately fail to show that the elements of either tort are met by a preponderance of the evidence.

### A.    Intentional Infliction of Emotional Distress

102.    To succeed on a claim of intentional infliction of emotional distress, a plaintiff must prove each of the following elements by a preponderance of the evidence: (1) the defendant engaged in extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the

plaintiff suffered severe or extreme emotional distress, (3) the emotional distress was actually or proximately caused by defendant's conduct, and (4) the plaintiff suffered damages. *See* Nev. J. Inst. 6.6; *Olivero v. Lowe*, 995 P.2d 1023, 1025–26 (Nev. 2000); *Star v. Rabello*, 625 P.2d 90, 91–92 (Nev. 1981).

103.   "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citation and internal quotation omitted).

104.   The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as relevant authority for emotional distress claims under Nevada law. *See Kelley v. City of Henderson*, 2017 WL 2802732, at *6 (D. Nev. 2017) (citing *Olivero*, 995 P.2d at 1027; *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980)).  The comments to the Restatement offer examples of when a police officer's conduct may be so outrageous as to support an intentional infliction of emotional distress claim.  Some examples include where the officer attempts to extort money by threat of arrest, attempts to extort a confession by falsely telling the accused her child has been injured in an accident and she cannot go to the hospital until she confesses, or otherwise engages in an "extreme abuse" of his position. *See* Rst. § 46 cmt. e, cmt. k, illus. 19.  "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities." *Id.* at cmt. d.

105.   Following pretrial rulings in the case, Plaintiffs' intentional infliction of emotional distress claims are limited as follows.  Manansingh's claim may proceed "insofar as he alleges that the [probation officers] entered his home with their guns drawn, fabricated evidence, and engaged in a deliberate pattern of actions designed to obtain a criminal conviction by use of fraud." [ECF No. 111 at 12.] Nairn's claim may "proceed only on the limited basis of [probation officers]' entry into her home."  [ECF No. 111 at 12.]  Both claims fail on the first element.

### 1.    Manansingh

106.   Manansingh has not shown that the probation officers' conduct in this case was extreme or outrageous.

107.   While there were uncertainties regarding both Manansingh's drug use and his financial condition at the time the search, neither the decision to search nor the manner of its execution were "outside all possible bounds of decency" so as to be regarded as "utterly intolerable in a civilized community." *Maduike*, 953 P.2d at 26.

108.   Officer Mummey followed the policy of the Probation Office in requesting the search of Manansingh's residence, expressly stating the reasons for his request on the Search Form, and additional reasoning was both discussed with his superiors and annotated on the Search Form by Chief Boardman.  Prior to the

search, Officers Mummey, Aquino, and Boardman discussed: (a) Manansingh's denial that he had used steroids despite the positive tests, even if such use occurred prior to the prohibition; (b) Manansingh's income but lack of bank accounts; (c) his failure to make any payments toward his fine; (d) the details of Manansingh's August 2015 arrest; (e) the statements from Lewis that Manansingh had taken her shooting at a gun range and she believed that they had fired handguns and a long gun and that he was using (and possibly selling) steroids while under supervision; (f) his failure to follow directives like registering his vehicle in Nevada despite repeated instructions to do so; (g) his failure to properly and timely submit monthly supervision reports and financial documents; (h) his failure to disclose his use of Nairns' BMW despite a specific directive to do so; and (i) his lack of candor regarding his use of Adderall.

109.    As it relates to Manansingh's financial circumstances, the probation officers indeed knew that Nairns was paying Manansingh's living expenses and rent. But, contrary to Manansingh's characterization, that information was not conclusive as to *his* financial circumstances nor did it mean that he was compliant with the terms of his supervision. While Manansingh disclosed his nominal income, (*see, e.g.*, Ex. 7), and a recent FinCEN check had not uncovered any large deposits or concerning transactions, (*see* Ex. 103 at 26), Manansingh had no bank accounts and had made no fine payments. While this opacity alone may have been

an insufficient basis for a warrantless search, it was representative of

Manansingh's repeated, technical noncompliance with the terms of his supervision.

Such noncompliance is only more concerning given the fact that Manansingh held

a Juris Doctorate degree and had been a practicing attorney, undermining any

claim that he did not or could not understand what was being asked of him.

110.   Plaintiffs' probation practices expert, Keith Hayes, a retired U.S.

Probation Officer with the Northern District of Georgia, opined that the probation

officers' conduct in proceeding with a search on this record "was not warranted"

and "was a total violation of the training, guidelines and supervision" of probation

officers.  According to Mr. Hayes, incriminating evidence was unduly emphasized

and exculpatory evidence was cavalierly ignored.  But these opinions fail to

consider the totality of the record.  While there were uncertainties regarding

Manansingh's drug use at the time the search occurred, it is not the case that

Officer Mummey's concern and suspicion regarding steroid use were either

unprompted or unsubstantiated.  The fact that the court specifically imposed a "no

steroid" condition in both Manansingh's December 2015 and January 2016

revocation judgments indicates that the court had a real concern that Manansingh

may have been using steroids.  And Dr. Uralets' email did not confirm or dispel the

suspicion that Manansingh could have used steroids between December 3, 2015,

when the "no steroid" condition was first imposed, and February 1, 2016, the date

of the first test.  Additionally, the positive drug tests in February and March 2016

corroborated information the Probation Office had received from Lewis in the fall

of 2015 regarding potential steroid use, making their reliance on that information,

and her report regarding firearms, more reasonable.

111.   As to the execution of the search, the officers did not enter

Manansingh's home with their guns drawn, they did not use racial epithets, and

they did not plant the ammunition in his nightstand.  Rather, they followed policy

in securing Manansingh before they began the search, photographing and

documenting all items of interest, and contacting the court upon discovery of the

ammunition.

112.   Following the search, Manansingh was arrested on a valid arrest

warrant issued by the court based on alleged violations of the conditions of his

supervision.  (Ex. 28.)  He eventually admitted at least some violative conduct and

ultimately received a revocation sentence of "time served."  (Ex. 37.)  This

sentence was separate and apart from his indictment based on the ammunition.

113.   Additionally, after the search, Officer Mummey followed up with the

drug lab regarding steroid metabolization,  (*see* Ex. 30), and the results of that

inquiry were almost immediately provided to Manansingh's then-defense counsel,

(*see* Ex. 31).  Officer Mummey also informed the Court of Dr. Uralets'

interpretation prior to the suppression hearing.  (*See* Ex. 64.)  While Officer

Mummey could have inquired about steroid metabolization earlier in his investigation, his failure to do so does not rise to the level of "extreme or outrageous." Nor does his subsequent conduct show any attempt to obfuscate or deny the inconclusive record regarding Manansingh's steroid use. Moreover, Dr. Uralets' email hurts Manansingh's credibility as much as it helps him. To be sure, Dr. Uralets' interpretation indicates that Manansingh may not have used steroids while subject to a "no steroid" condition of supervision, as his use could have been as early as February 2015. However, Manansingh maintains that he never used steroids at all despite the positive test results. There is no evidence in the record that either test was administered incorrectly or that the results were false positives. Manansingh's continued denial therefore undermines his credibility.

114.    Nor was Officer Mummey's subsequent involvement in Manansingh's prosecution for the ammunition "extreme or outrageous." Both the Probation Office and AUSA Smith testified that it was common for probation officers to aid in new criminal prosecutions that arose out of a probationary search, functionally acting as "case agents." While Officer Mummey could have provided additional information to the prosecution regarding Manansingh's compliance with the terms of his supervision, his representations and omissions were far from outrageous. *See Kahn v. Morse & Mowbray*, 117 P.3d 227, 237 (Nev. 2005) (explaining that alleging mere negligence is insufficient to show extreme or outrageous conduct).

For example, in his November 9, 2016 summary email to AUSA Smith, Officer Mummey stated that Manansingh "failed to ever submit any type of documentation such as a pay stub or monthly bill that he paid." (Ex. 128.) While Manansingh is correct that this assertion fails to account for the fact that he sent Officer Mummey copies of some of his paychecks, he did not in fact present Officer Mummey with either a pay stub or a monthly bill.

115.   Because Manansingh did not show by a preponderance of the evidence that the probation officers' conduct was extreme or outrageous, his intentional infliction of emotional distress claim fails on the merits.

### 2.    Nairns

116.   Nairns also fails to show that the probation officers' conduct during the search was extreme or outrageous.

117.   Nairns was not restrained or forced to be present during the search. The officers did not say or do anything threatening or inappropriate. After Nairns indicated she would prefer not to engage in small talk, the officers did not address her further. Nairns did not make any complaints or voice any concerns to the Probation Office or the court about the search while it was being executed or in the months that followed.

118.   Nairns' perceived indignity of having her personal space invaded by strangers is insufficient to establish extreme or outrageous conduct.

119.    Because Nairns did not show by a preponderance of the evidence that the probation officers' conduct was extreme or outrageous, her intentional infliction of emotional distress claim also fails on the merits.

**B.    Abuse of Process**

120.    The elements of a tort claim for abuse of process in Nevada are: (1) an ulterior purpose by the defendant other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. *See* Nev. J. Ins. 6.7; *LaMantia v. Redisi*, 38 P.3d 877, 879 (2002).

121.    "An ulterior purpose is any improper motive underlying the issuance of legal process." *Posadas v. City of Reno*, 851 P.2d 438, 445 (Nev. 1993). "A showing of malice and want of probable cause is not necessary to recover for abuse of process." *Id.* Nevertheless, "[c]ourts have repeatedly emphasized that using a legal process in a way it is authorized to be used, even with bad intentions, is not enough." *Allstate Ins. Co. v. Shah*, 2017 WL 1228406, at *2 (D. Nev. 2017) (collecting cases). "[A]n act that carries out the legal process to its authorized conclusion is not an improper act—even if the defendant had bad intentions." *Mazzeo v. Gibbons*, 2010 WL 11629641, at *3 (D. Nev. 2010) (citing Prosser, Law of Torts, § 121, 857 (4th ed. 1971)). A willful, "improper act must be so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure." *Id.* (quoting *Nienstedt v. Wetzel*, 651 P.2d 876, 882 (Ariz. Ct. App.

1982)).

122.    "The Nevada Supreme Court has found improper acts where a defendant commits a flagrant or extraordinary act that perverts the legal process." *Mazzeo*, 2010 WL 11629641, at *3.  For example, such an abuse has been found "where a plaintiff attached an entire property, worth over $30,000, to secure a debt of less than $5,000, *id.* (citing *Nev. Credit Rating Bureau v. Williams*, 503 P.2d 9, 13 (Nev. 1972); "when a city attorney charged a police officer with a criminal violation in order to obtain the officer's voluntary resignation," *id.* (citing *Posadas*, 851 P.2d at 445; and "[c]oercing a settlement where there was no legal basis for a claim," *id.* (citing *Bull v. McCuskey*, 615 P.2d 957, 960 (Nev. 1980), *abrogated on other grounds by Ace Truck & Equip. Rentals, Inc. v. Kahn*, 746 P.2d 132 (Nev. 1987)).

123.    On the other hand, "maintaining a lawsuit for the ulterior purpose of continuing litigation as a lever to obtain settlement d[oes] not demonstrate any ulterior purpose other than resolution or settlement of the suit, which [is] an acceptable use of process." *Mazzeo*, 2010 WL 11629641, at *3 (citing *Rashid v. Albright*, 818 F. Supp. 1354, 1359 (D. Nev. 1993)).

124.    Notably, "abuse of process hinges on the misuse of regularly issued process in contrast to malicious prosecution which rests upon the wrongful issuance of process." *Bull*, 615 P.2d at 960.

### 1.   Manansingh

125.   Manansingh cannot show either an ulterior purpose or a willful act.

126.   Manansingh's claim for abuse of process rests on his assertion that the Probation Office, Officer Mummey, and AUSA Smith wrongfully searched his residence, planted evidence, and charged him with new criminal conduct as part of a personal vendetta against him.  Indeed, Manansingh presented evidence that his relationship with the Probation Office was contentious and that Officer Mummey zealously supervised him.  However, Manansingh's own theory of the case shows that the purpose behind the Probation Office's supervision and investigation was to uncover noncompliance and pursue criminal charges if such noncompliance was unearthed.  The officers' intent to ensure his compliance with both the terms of his supervision and the law, however detrimental to Manansingh's autonomy or privacy, is not an ulterior purpose.

127.   Nor does the probation officers' conduct demonstrate the necessary willful act.  The Probation Office supervised Manansingh consistent with their federal statutory obligation.  *See* 18 U.S.C. § 3603.  The decision to charge Manansingh with new criminal conduct was made independently by the United States Attorney's Office, and both the Probation Office and AUSA Smith followed the normal course of conduct in that prosecution, including presenting the case to a grand jury and defending Officer Mummey's decision to search Manansingh's

46

residence at an evidentiary hearing.

128.   Because Manansingh did not show by a preponderance of the evidence either an ulterior purpose or a willful act, his abuse of process claim fails on the merits.

### 2.   Nairns

129.   Nairns also fails to show either an ulterior purpose or a willful act.

130.   Nairns' claim for abuse of process rests on her assertion that the Officer Mummey used the service of subpoenas to threaten and intimidate her. However, the record shows that the Probation Office regularly served subpoenas related to offenders under supervision, and Officer Mummey never said or did anything unprofessional when serving Nairns.  The subpoenas were all served for valid court proceedings at the request of the prosecutor.

131.   Because Nairns did not show by a preponderance of the evidence either an ulterior purpose or a willful act, her abuse of process claim also fails on the merits.

### CONCLUSION

Based on the above, IT IS ORDERED that pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court finds in favor of the United States.

IT IS FURTHER ORDERED that the Clerk is directed to enter judgment under Rule 58 of the Federal Rules of Civil Procedure in favor of the United States and against Plaintiffs.

DATED this _14_ day of June, 2025.

Donald W. Molloy, District Judge
United States District Court